Next case on today's docket is the case of Justin Beattie v. Rebecca Bybee. And we have attorney Susan Wilson representing the appellant. And we have Mr. Jeffrey Hamill representing the appellee. You may begin. May it please the court. Mr. Hamill, my name is Susan Wilson and I am representing today's appellant Rebecca Bybee. Before the court today is an appeal of an order by Judge Cruz, a permanent modification of custody with regard to a minor child whose name is Justin. And to clarify, because of the father's name he does not also be referred throughout the briefs and all other documents, the minor child is J.J. This is a paternity issue. The parties were never married. J.J. was born November 19, 2004. On September 7, 2006, Rebecca was awarded sole custody of J.J. and there was no challenge to that custody until approximately November of 2011. The case itself was heard on December, mid-December of 2012, wherein at that time the judge entered a temporary order modifying custody. And the temporary order says that she's going to babysit this case for 90 days. She's going to re-look at the case in 90 days and determine whether the temporary order should become a permanent order or whether the child should be returned to the mother. She also states on the record and in the order that it could be subject to change immediately if she found during the pendency of this time anything that was such that raised her concerns to the point where it should be changed back immediately. The order, which was filed on December 17, 2012, the temporary order, found a change in circumstances existed, not a substantial change in circumstances argued in the motion dismissed by Mr. Hummel. And I believe this is important. Not only did the order in December 2012 not find a substantial change in circumstances, it did not find that the order was being made pursuant to clear and convincing evidence warranting a modification of custody. And I'm going to digress this briefly before the court as well as the arguments itself, Mr. Hummel's motion to dismiss. In his motion to dismiss, he states that because he states that we should have appealed from the temporary order, that we should not have waited until the permanent custody order because he says that pursuant to a case, and the case, I believe it says already, is what he cites in his brief, C-E-S-A-R-E-T-T-I. He cites that particular case, the 1992 district case, to state that because in that particular case the court found a temporary order to be appealable, that that means that basically, or I think he would want you to believe that all temporary custody orders are now appealable based on the facts in this case. So I think it's very, very important to distinguish CESA-RETI from what we have before the court today. In CESA-RETI, they had a judgment of dissolution where all of the issues were resolved. And in that particular case, the judge who had had a temporary order in place for almost a year, from 1988 to 1989, he had a temporary order in place with regard to the custody. When it came to the final, the judgment of dissolution, he then, instead of issuing a permanent order, he issued another temporary order. And the court said, the appellate court said, enough is enough, basically. You should have some finality here. We've already had a temporary order for a year. We need a permanent order for purposes of the facts in this particular case. And based on the fact that all of the other issues are right for appeal, we're going to take this issue of this temporary order up with all of the other issues. And they use the word piecemeal. They don't want to do things piecemeal throughout this case. And I think that is very distinguishable from what we have in the case before the court today. Ms. Wilson, CESA-RETI says that you should not make temporary orders, doesn't it? Yes. Is that what you believe the December order was in this case? The December order was definitely a temporary order. The court and, well, they said, in fact, we would be subject to change in 90 days. So, clearly, if it were a permanent order, it would not be subject to change for two years unless there was some kind of major finding in the meantime as pursuant to the statute. Another reason I believe that this case can be distinguished from the CESA-RETI cases. In CESA-RETI, they made a six-month temporary order. In that case, there was, because this other appeal was pending and six months before the final hearing, there was time to determine if that temporary order was appropriate or not. But I think the most important distinguishing thing in CESA-RETI, if the court were to see that as precedent in any way here, the court in CESA-RETI took the temporary order, mind you, the second temporary order of the court, and said, we don't know what the permanent order should be. We're going to remand back to the circuit court for a permanent hearing. If, in this case, as Mr. Hamos suggested, we should have appealed the temporary order and said, okay, there shouldn't have been one, and so, therefore, we should have appealed at that point, based on CESA-RETI, the court here would have said, let's remand it back and have a permanent hearing. If the court here remanded it back for a permanent hearing, the permanent hearing is in three months. We wouldn't have even had our briefs ready to go. I mean, we wouldn't have had probably the transcript ready. So I believe suggesting that based on CESA-RETI that somehow we were supposed to appeal a temporary order in this and somehow use that as precedent to dismiss the appeal altogether is not well-founded. I believe in this particular case that the three-month period was a temporary time, and I do argue that there shouldn't have been a temporary order. But the real important reason I argue that is how could you possibly say that something is clear and convincing when you can't even find enough evidence to make a permanent order from it? And even as important, there is no finding at the temporary order, nor at the permanent order, never a finding of clear and convincing evidence, which is required by the statute in 610. The court never found that. Now, with regard to the issues as far as what the custody and whether there should have been a custody change, if we go to the next point with regard to that, it's we have a paternity action, which I think sometimes looked at a little bit differently from a marriage. We have a paternity action, and the mother is the testimony of the mother. She's a good mother. And look who testified on her behalf. Justin's mother testified on behalf of Rebecca Byde. Now, is this during the temporary hearing? Yes. The December hearing. There was no request for a temporary order ever, but the order, the hearing was for permanent custody. The court on its own made it a temporary order and said they were going to review it. But weren't there two hearings? There was one major hearing, and then there was a review hearing in March of 2013, wherein the court had asked the guardian ad litem to take a look at things in that interim period and to give a report. And with regard to the guardian ad litem, the things I think are significant with regard to the guardian ad litem is she is the only one that saw the child. The court did not talk to the child. The court did not have in camera with the child. The court had no contact with the child other than the testimony of the parties in the guardian ad litem. The guardian ad litem, who was to be looking at what was best for the child, in December recommended mother keep custody. Said that there's all kinds of allegations and we have people, we have allegations. We have very little evidence, things about mother's boyfriend, et cetera. But saying mother's boyfriend was making a non-safe environment for the child, the guardian ad litem specifically asked the child, where do you feel safe? And the child said, at my mother's house. Where do you feel safe? At my mother's house. There was never any statement by the child ever to the guardian ad litem, the person who was instilled with the protection of that child and the best interest of that child. The child never once spoke of a problem at the home with the boyfriend's mother or the mother. But as I started to say earlier, the mother has a very good record. She's a good mother. Justin, the father's relatives, testify on behalf of the mother. And I made a statement in the court in 27 years. It's, I think, a first for me at that point that when I made the statement, the relatives are all testifying for the other side. I felt that was very significant. Now, after that point, the great-grandfather came on, an 80-year-old great-grandfather, and said everybody was great and all that on behalf of Justin, the father. But I found that to be very indicative. I find also very probative in this matter that they try to make a big deal about the boyfriend, who, by the way, it's not a secret, he had an issue with marijuana. He got caught growing marijuana. He got sent to jail, prison, for growing marijuana. He's gone from the home and will be gone for a number of years. But didn't the dad have a conviction also? Not only did the dad have a felony conviction, a burglary, where he was in prison when the child was born. And my reply brief goes into that. He has multiple DUIs, multiple driving on revoke. He's not had a driver's license since 2006. Does he still not have a driver's license? At the time of the hearing, no driver's license. He said he was going to get one. He said it was going to come up. But at no time ever, any of the evidence here did he ever get his license back. But they want to make a big deal about boyfriend going to prison for marijuana. But in my brief, you will see the Facebook posts, and guess what? Facebooks are not secret. Justin Beattie's Facebook posts, which I think they said they had thousands of friends. They have marijuana plants on their clothing. They have marijuana plants on their hats. They are at concerts where marijuana could, you know, be available. They have no problem posting on Facebook marijuana, marijuana pictures, and yet they want to make a big deal about Mr. King's marijuana imprisonment and try to act like because he went to prison, somehow he's unfit to be at the home or be around the child. But during the pendency of this case, because it went on from November 2011 to December 2012 before the hearing, Mr. Beattie was incarcerated for 60 days because he had violated one of his many issues before. We were never quite sure which one it was because he was always uncertain. I don't know if he had so many. He didn't know which one was which or if he was intentionally not saying which one was which. But he was incarcerated for 60 days. Now it was work release, and they tried to make a big deal out of work release. But one of the big issues they had, and again I say my client is a very good mom, very good reviews of her. They tried to make a big deal about the fact there had been some visitation issues prior to the hearing. But if you look at the visitation issues in 2008, there was a hotline of Mason, who was Justin Beattie's stepchild at the time and would later be adopted, and there was a hotline by mandated reporters that Mason had done something inappropriate to JJ. Based on hotline reports and DCFS investigation, my client's mother said, I don't think that's an appropriate place to be right now. And so in 2008, she withheld the visitation of the child pending those investigations. The investigations came back unfounded. They make a big deal about the fact they're unfounded. But if you look at them, one of them is unfounded because Mason was six years old, and they said they couldn't make a finding on a minor child. They also, in the reports there, didn't really talk to JJ. They talked to everybody else. So we have unfounded reports. But I suggest to you, as I suggested to the court, that DCFS has not always been perfectly accurate in their findings in the past. Ms. Wilson, how old was JJ then at the time? He would have been three. Okay. And the mother had nothing to do with those reports? She did not call it in. The counselor at school, I believe, and a counselor that they were seeing called it in. So there were two different reports, but they were related to, I guess, the same incident? In 2008, I believe there were two different reports. There was another one later on, which I don't want to get confused with that one. But in 2008, the visitation issues centered around that. And the court said, yes, the visitation shouldn't have been withheld, until they made it up. But that was the reason for the visitation issue at that point. Thank you, Ms. Wilson. You'll have the opportunity for rebuttal. Mr. Hamill. It's a pleasure to be here to speak on behalf of Justin Bacon. I'm going to tell you that I think 100% that Judge Cruz made the right decision. When she made the decision changing custody. I don't want the courts to lose sight of the standard against which all custody actions are supposed to be guided, and that's the best interest of the child standard. We talk about best interest of the child so much in family court. We're familiar with it as family practitioners. Trial judges are familiar with the statutes. We can recite Section 601, the best interest standard. Section 602 is a myriad of factors that the court can consider when it determines what is in the best interest of the child. And Section 610 also refers to the best interest of the child. In fact, we say this best interest so much in the family arena that we had a judge back in St. Clair County several years ago, who shall remain nameless, Judge O'Malley, who wouldn't let the lawyer say this magic word. You can't say best interest of the child because it was kind of a tongue-in-cheek rule, but the thing is that is the basis of everything that we have to consider when we determine whether or not custody should be changed or whether or not it should stay the same. Section 602 provides many factors that the court should look at in determining what is the best interest of the child. Would you agree that a change in custody is, by Clarence, convincing? Yes. Yes, ma'am. Which is a very high burden. I'm sorry? High burden. Very high burden. High burden? High burden. Yes, there's no doubt about it, that it is a high burden. We appreciate the legislative intent that there's a presumption with the custodial parent because there's some presumption about continuity and stability in the parent's environment. But under Section 610 provides that there must be a show of a change in circumstances and it must be clear and convincing evidence that it is in the best interest of the child to change custody. Is it just a change in circumstances or substantial? Substantial change in circumstances. Which is different? It is. It is different. And I can assure you after I, if you would hear the testimony from all the witnesses or read all the transcripts, you'll find that there was a myriad of changed circumstances in this household. But most importantly, we find that there was behavioral changes in the child. We find that the child had compulsive behavior. He was obstinate. He had temper tantrums. He wet his bed. He had nightmares. And I'm going to get into that, Your Honor, and I appreciate that comment. But Section 602, there's a myriad of factors. What is the child's adjustment to his home, school, and community? What is his interpersonal relationship with his parents, with his siblings, with other persons that may affect his best interests? Is there any violence or threat of violence in the home, in the environment? And also, do the parents have an ability to effectuate and facilitate a close and continuing relationship with the other parent? And I can assure you that those factors especially were brought out in these hearings. Now, Your Honor, there was three days of testimony in this case. The petitioner, my client. Mr. Homel, I don't want to interrupt you, but if you have a clear and convincing standard, then why does the judge enter a temporary order that's going to be reviewed? Doesn't that sound like there was some hesitation there? I appreciate that, Judge. Judge Cruz, when she made her ruling, she used the word clear. She said in her decision, in fact, she was talking about a case that had been cited by the respondent in the marriage of Nolte. Nolte had to do with the fact that there was a paramour living with the mother. And the judge said, basically she said, we're not going to follow Nolte. This case is distinguishable. She says, in Nolte, it's indicated the child hasn't displayed any behavioral problems. Absolutely opposite here. We have a kid that has displayed behavioral problems. What was more clear out of everything, and probably more profound to me, is that a licensed clinician raised some issues that an 8-year-old or younger, depending on when he said it, this little child said this, I'm stressed out at home and at school. That was one of many things that this child said to this trained counselor, trained therapist, that caught the judge's eye. And I'll tell you more things about what the child said to the counselor when he interviewed him. In fact, Ms. Wilson indicated that the GAL was the only person that ever talked to this child, and that's not true. The judge herself thought that it was very significant that this 8-year-old was making all sorts of comments to this trained clinician, to this counselor, about the problems that he was having. He's a stressed out little boy. I'm having problems at home and at school. He says, I'm stressed out at home and at school. And he comes into the clinician's office, and he asks her, is this place bulletproof? Originally, this therapist initially saw the child as a result of the mother coming to him, saying, I can't discipline this child. He has oppositional behavior. He won't listen to me. He's constantly disrespectful to me and to my mother. And so when Ms. Wilson indicates that there was no input from anybody but the GAL, that's not really true at all. Did the counselor make a recommendation, a trial? No. The counselor indicated this was a counselor actually that was Ms. Wilson's witness. The counselor saw the child for about four months. She said that throughout this period of time, he continued to have these very, very stressed out comments. He continued to make comments indicating that he wasn't adjusting well to his home or his community. And, you know, in child custody cases, the trial court is the one that looks at the witnesses. They judge the demeanor of the witnesses. And they're the ones that we give the key to the gate. And, Judge, I didn't answer your question exactly that you had, but maybe it was a long one to answer that. How could the judge have clear and convincing evidence of the change in custody, like she said she had, but still made it a temporary order? Well, my last question was, did the counselor make a recommendation? Okay. Yes or no? All right. Thank you for putting me back on track. I'm curious. The counselor indicated that once she realized that this was in litigation, she didn't want to be a part of it. She indicated that she wasn't an expert in this kind of thing. She suggested that maybe Becky should go somewhere else if she really wanted someone to testify. To the contrary, she said, I'm not going to give an opinion as to what I think is the best interest of the child. But she told the judge, well, she told the judge because we stipulated her discovery deposition testimony. So we read her deposition. Actually, the judge read her deposition. And she could take things out of it as far as what the child reported to the therapist. Wasn't there a teacher, though, that made a recommendation as well? Well, actually. Or somebody from the school? Actually, Judge, in the review hearing, there was not a record made. In the review hearing, the only reason that there was a review hearing is that this judge wanted to see if the little boy, if a train wreck was going to happen. He was demonstrating that he had behavioral problems. He was demonstrating that he was very, very stressed out at home and in school. And the judge wanted to make sure that when this changed became effective. In fact, she made it effective immediately. Well, she made it effective when school started right after the Christmas break. And I think this hearing was in December. And the judge wanted to know if the kid became catatonic or if the kid became really stressed out more so. And so the review was not to determine or weigh the evidence any further. The review hearing was to see whether or not there was a serious endangerment to the child that might be supported by other people that came forward and say, hey, this kid is stressed out. The only teacher that testified was a teacher at the review hearing. Her name was Ms. Silby, and there wasn't a record made. There were four exhibits that were admitted. And those exhibits demonstrated that after the child was returned to the father and stayed with the father, that he was thriving. He was doing great in school. His reading capacity had, like, tripled. He was making friends in school, and there was no showing that he had these temper tantrums, that he had oppositional behavior, that he had these fits of paranoia. And many of these things happened while he was in the home with this other, with the new boyfriend who has a child with Bob. There's two things that impressed me about the judge and her willingness and her ability to consider the evidence. And that was we had, I want to say that we, each party had a number of witnesses. There were three days of trial. The respondent called five live witnesses. Justin called six live witnesses. Additionally, there were DCFS workers that testified through their prior depositions, prior court appearances in 2008. And last but not least, there was this Dr. Patricia Kennedy. And we gave Judge Cruz these transcripts to read, and she read them. And during the trial, she in fact questions the parties about what she read in the depositions. At one point in time, and there was a discussion about these things that the child was exhibiting at the therapist, these comments that the child was making. Is this place bulletproof? Being really stressed out. And Ms. Wilson made an objection. She said, Your Honor, I don't believe the home has ever been the testimony. I believe that he was under stress. She tried to suggest that it was not at the home, just at school. The court said, she quoted what the child said. Ms. Patricia, I have been through a lot in the past few weeks. I get stressed out a lot, both at home and at school. The judge cited the testimony during the testimony. Another time when Ms. Bybee was testifying about she, Mason is my client's adopted son. Hallie is his wife. Mason is Hallie's child, and my client adopted Mason. And whenever things get tough for Ms. Bybee, she seems to make an allegation against Mason. And she continues to make allegations against Mason. And in texts that she sends to my client that were made, that were actually exhibited by Rebecca, she calls little Mason a fruit fly. She talks about these sexual things. And the judge stopped it right there. And she said, Ms. Bybee, I want to ask you a question. She read from one of the testimonies of the DCFS worker. And the DCFS worker said, we investigated this. We investigated the home. We investigated the people. We talked to the doctors. We talked to the teachers. And we found that there was no way, no how any of this happened because the kids weren't even together when it was alleged. Now, there were two allegations that were investigated back in 2008. And again, when we were getting close to this conflict, there was another allegation that was again unfounded by the Missouri DCFS. Mason and JJ get along great together. There is no sexual problems. There are no whatever it is. We had all sorts of people that came forward to testify what a great dad Justin was, what a great stepmother Hallie, his wife, was. And to suggest that everybody who was my client's witness testified against him is absolutely foul. Now, one of the witnesses that we brought forward to testify was a gentleman by the name of Ernest James Mason. He was the 86-year-old. And he came and testified that the home that my client lives in with his wife, with his two children, was the home that he grew up in. I want to make this very brief if I can. I'm sorry that I took this 15 minutes. We've been at this case, I've been at it since 2008. You can actually just complete your thought and that's all the time you have. All right. My thought about Mr. Beatty, Mr. Ernest James Beatty, is that he was an 86-year-old gentleman who had all sorts of contact with little JJ and with Mason. He had fought in World War II. He had fought in the Korean conflict. He's a musician. He gets together with these kids several times a month. His son, Tim, my client's father, lives on the same property and often interacts with little JJ, with Mason, and with all sorts of kids that come to the farm to play. He testified that he and his son are often playing music together. They've gone to concerts together. And what do we hear about this gentleman who testified for the best interest of the child? Becky Post puts a picture of him, and the only comment they have about him is that he proudly, on Facebook, proudly has a shirt with a marijuana leaf. First of all, Mr. Beatty, this is not a marijuana leaf. Okay? This is a Tommy Bahamas shirt. It has sperms on it. And, one, it's not a marijuana leaf. Number two, he was asked about it in court. He said, Mr. Hanlon, I think your time has expired and your point is well taken. We will take notice of the Tommy Bahamas shirt. I could go on for hours, Your Honor. We don't. Okay, I appreciate it. We have other cases coming on, too. Thank you. Thank you very much for your brief and argument. Ms. Wilson, you have opportunity for rebuttal. That does look like ferns in the Tommy Bahamas shirt. Well, with regard, let me, I know we're brief here. With regard to the stepmom, they said she's just a wonderful person. This wonderful person was told by the judge in two separate orders, once at the temporary order and once in the permanent order, she should stay back. Let the parents parent the child. She was given two specific orders, basically, to back off. And if you look at the testimony, one of the issues here, one of the changes of circumstances when Mr. Beattie married his now wife, the family members were then ostracized. They didn't go around as much. They hardly saw the child at all. They had to get all of their visitation of J.J. through Becky, not through them. And it was at the time of the marriage of this wonderful stepmom who was ordered by the judge twice to back off. With regard to the behavioral changes, it was when he started school. And there's a history of ADD in the family. Mom reached out to dad and said, hey, we're having some issues. Grades are good. Grades never were a problem. They tried to make out like there were problems with grades or weren't. It was behavioral issues. He was having trouble concentrating. I will say, though, Ms. Wilson, you're talking about mom reaching out to dad, and texts live on forever. I'm just looking at the text that's quoted that she said some pretty disparaging things. She does, Your Honor. They have one text and they have one Facebook post a year or more, several months, let's say, before that one time. I'm just talking about a concern about fostering a relationship. That was private. Unless they showed it to the child, the child never. No, I'm talking about her fostering a relationship between the father and the child. And that was very inappropriate. She admitted it was inappropriate and it had to do with when she reached out and said, I need help. And he's like, you're just trying to medicate this child. He testified, medication is not the answer. And yet, if you look at the second GAO report, which is what the judge said she heavily relied on, the child says, now that I'm on the medicine, I can now concentrate. Now that I'm concentrating, it's easier for me to pay attention in school. And they make a big deal about his grades, his reading improving, but if you can't concentrate, if you need AED medicine and you don't get it, and he got it administered to him just before the change of custody, if you don't get it, then you can't work on that issue. So there was no way to see how that would affect him at the home because he was taken out of the home before the medication was even allowed to take effect. But with regard to his statements about bulletproof and his statements to Dr. Kennedy, I think it's really important to know that at the time when those statements were made was during the 60-day incarceration. My client found out that Mr. Beatty was in jail. The visitation was occurring with Jason and the stepmom, who we find out later has been overly involved. She said to Justin, I will give you makeup visitation once you get out of jail. I don't think it's appropriate for the child to be there and you not to be there. She promised it. She followed through. She voluntarily gave it. But in the meantime, he filed and said she was violating visitation. It was during this period of time that my client took the child to Dr. Kennedy, and he's saying, I'm all stressed out here. I'm upset. Well, they're fighting over whether he goes there, whether he doesn't go there, whether his dad's in jail, and whether he should have visitation with just Mason and stepmom and not dad there. But with regard to the GAL report, she says in her second report, the child wants to return to mom. The child misses his brother. The child feels like he's doing better, but that's since he took the medication. The judge said she heavily relied on the GAL report, who recommended that mom have custody, and that's the only recommendation. You've asked questions about all these other people. Nobody else recommended anything. The GAL recommended custody to mom.  But the facts were that he was doing better, but he attributed it himself to, I feel calm, I'm feeling my medicine and all that is taking effect, and I want to go back to mom. I want to go back to where I feel safe. I want to go back. Dad keeps telling me, and this is in the report, to tell everybody I want to stay with him, but I don't want to stay with him. I want to go back to my mother. The judge says she heavily relied on the GAL report. I think that that is not the case here. I think there was a lot of innuendos and a lot of allegations, and, yes, some inappropriate things on the part of both of them, but it doesn't rise to the level of a clear and convincing change of circumstances as warranted. Thank you. Thank you, Ms. Russell. Mr. Hamill will take a matter under advice. Thank you. Appreciate it.